# CHARLES O. MOOSBRUGGER v. McGRAW-EDISON COMPANY AND OTHERS.

170 N. W. (2d) 72.

July 18, 1969—Nos. 40284, 41449.

*Stringer, Donnelly & Sharood* and *Henry H. Cowie, Jr.,* for plaintiff.

*Dorsey, Marquart, Windhorst, West & Halladay, William A. Whitlock, and Malcolm D. Young,* for defendants.

Heard before Knutson, C. J., and Nelson, Otis, Rogosheske, and Peterson, JJ.

NELSON, JUSTICE.

The action involved on this appeal was commenced in Ramsey County District Court by plaintiff, Charles O. Moosbrugger, against McGraw-Edison Company, American Laundry Machinery Industries, Small Equipment Sales Company, Equipment Acceptance Corporation, Ellis and Watts Products, Inc., and Econ-O-Wash, Inc., seeking damages founded on claims of negligent manufacture of six coin-operated dry-cleaning machines and breach of express and implied warranty.

Plaintiff on July 26, 1961, entered into a contract with the seller, Econ-O-Wash, Inc., for the purchase of six Econ-O-Crest coin-operated dry-cleaning machines and related advertising and other items for a total purchase price of $18,602.40, of which

$17,422.40 was paid as a cash downpayment, the balance of $1,180 to be paid in installments of $33 per month. In this action plaintiff sought recovery of his investment, installation costs, loss of profits, and other expenses. After trial the jury returned a verdict in favor of plaintiff on December 20, 1965, and assessed his damages in the sum of $17,170.

Plaintiff appealed from an order denying his motion to correct the verdict by adding thereto interest at 6 percent per annum from and after October 4, 1961, the date on which plaintiff allegedly purchased the machines. Defendants McGraw-Edison Company, American Laundry Machinery Industries, Small Equipment Sales Company, and Equipment Acceptance Corporation (hereinafter collectively referred to as the defendants) appealed from an order denying their motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The manufacturer of the machines and the ultimate retail seller of the machines, Ellis and Watts Products Company, Inc., and Econ-O-Wash, Inc., respectively, were named as defendants but were not represented during the trial of this action and were found in default.

Plaintiff in his complaint made the following allegations:

"That said machines were designed and manufactured by or on behalf of the defendants McGraw-Edison Company, Ellis and Watts Products Inc., American Laundry Machinery Industries and Small Equipment Sales Company, who together with defendant Econ-O-Wash, Inc. expressly and impliedly represented and warranted to plaintiff that said machines were suitable and fit for the purposes for which they were sold and intended to be used and plaintiff could earn substantial profits from their operation, and that plaintiff relied thereon in making said purchase and entering into said financing arrangements.

"That notwithstanding the foregoing, said machines were carelessly and negligently designed, manufactured, sold and delivered by said defendants; that the representations and warranties made by them to plaintiff in Minnesota were false and

fraudulent, and that said machines were in fact and are defective and inoperable.

"That timely notice of defendants' breach of warranties has been duly given by or upon behalf of plaintiff herein."

It appears that at the trial defendants admitted that plaintiff's machines did not operate properly. They contended that the improper operation was attributable to faulty installation and to the poorly supported floor upon which plaintiff had placed the machines.[1]

The machines were installed by one Walton Lindquist, whom the jury found not to be an agent of defendants. The evidence revealed that installation was effected without referring to the installation manual and was improper in many respects, the machines having been set on a wooden floor which was supported by jacks placed in the basement.

Defendants also moved for a dismissal of the action or a directed verdict on the ground that plaintiff had failed to prove timely and proper notice of the alleged breach of warranty. The court denied the motion. Defendants then submitted requested instructions on timely and proper notice of the alleged breach, which were refused. Here defendants claim that the trial judge failed to give any instructions on notice and that the jury was not given the opportunity of considering that question.

If all conflicts in the evidence are resolved in favor of plaintiff as the prevailing party below, the facts appear to be as follows: Plaintiff, an advertising manager for Minnesota Mining and Manufacturing Company who had no technical or mechanical training, became interested in purchasing coin-operated dry-

---

[1]This court has observed that historically breach of implied warranty in the sale of goods was a tort. Nelson v. Anderson, 245 Minn. 445, 450, 72 N. W. (2d) 861, 865. We have also enunciated the rule that in an action based on breach of warranty contributory negligence of the buyer is a valid defense. In Gardner v. Coca Cola Bottling Co. 267 Minn. 505, 511, 127 N. W. (2d) 557, 562, we recognized that the defense of improper use is, in essence, contributory negligence.

cleaning equipment from defendants as an investment in the spring of 1961, after seeing advertisements in the Wall Street Journal and Business Week, directed at people who were seeking investment opportunities. These advertisements, which plaintiff introduced into evidence, emphasized the vast experience and skill of defendant American Laundry Machinery Industries in the laundry industry, stating that it was the world's largest manufacturer of professional laundry and dry-cleaning machinery. Defendant McGraw-Edison's name also appeared in the advertisements. The advertisements represented that no specific experience would be necessary to operate the machines; that they would run unattended; and that trained representatives of defendant American Laundry would assist in setting up and operating the machines. The advertisements promised exceptional, high-profit returns on an investment in the machines. The advertisements first appeared in the Wall Street Journal March 29, 1961, and on at least 25 later occasions. A prime inducement to plaintiff's subsequently entering into the contract for the purchase of the machines was the representation contained in such advertising that these machines would run "unattended." However, Charles M. King, manager of American Laundry's engineering department, testified that the machines were not in production until October 1961, 6 months after the advertisements began. Defendants had a prototype model which was tested in May and June of 1961, 2 months after the first advertisements appeared in the Wall Street Journal.

Plaintiff was not aware that these machines were in a primitive stage of development but was convinced by the advertisements, brochures, sales materials, and other materials provided by defendants that they were experienced, sound, and stable corporate enterprises, and that the machines would run "unattended" as advertised. Thus, plaintiff entered into a conditional sales contract on July 26, 1961, to purchase six machines. The contract form bore the following:

"* * * Distributor for Small Equipment Sales, American

Laundry Machinery Industries, Division of McGraw-Edison Company * * *."

The insurance certificate furnished plaintiff which covered the machines referred to McGraw-Edison as vendor. In view of these facts, plaintiff contends that the seller under this sales contract was not Econ-O-Wash, Inc., as defendants have claimed, but instead defendants themselves. The machines arrived by truck in late December of 1961. Their installation was supervised by Wally Lindquist, who had been trained by defendant American Laundry. Lindquist had been hired to work on the machines by John E. Whelan, who at that time was selling coin-operated dry-cleaning and laundry equipment and related items and had been hired by Econ-O-Wash, Inc. There was no evidence that the "trained representative" referred to in the Wall Street Journal was anyone other than Lindquist.

Installation was completed January 16, 1962. Defendants had failed to ship with the machines the installation manual. Plaintiff encountered many difficulties immediately which defendants claimed were due to piping that was too long and of the wrong type and to a poorly supported floor. To prove that this was not the case, plaintiff introduced the testimony of three other owners of identical dry-cleaning machines manufactured by defendants. Douglas Oppel and Edgar Charles received their coin-operated dry-cleaning machines at the same time plaintiff received his. The third owner, Oliver Kinnunen, received his machines in May 1962. Their testimony revealed that their machines were installed on a cement slab or concrete floor laid directly on the ground. Each of the owners had followed the instructions in the installation manual very precisely in installing the machines and in particular had had a compact system of galvanized pipe installed rather than the copper pipe which was installed for plaintiff. Despite ideal flooring arrangements and strict compliance with the installation manual, the other three owners had encountered difficulties markedly similar to the difficulties encountered by plaintiff—faulty doors, gaskets, switches, and

timers; perk (solvent) leaks; motor burned out; machines would not go through automatic cycle; excessive vibration; pulley problems; customer dissatisfaction.

On January 30, 1962, plaintiff wrote the following letter (defendants' exhibit 12) to Holland G. Williams, president of Econ-O-Wash, Inc., sending a copy to a representative of defendants:

"Dear Mr. Williams:

"Last fall I negotiated for the purchase of 2 units of 3 Econ-Crest dry cleaning machines each, from your company and sent you a check for $17,422.40, with a balance of $1,000 to be paid over a 3-year period. In all of my dealings I have followed the recommendations of your representative, Mr. John Whalen, to the letter. Mr. Whalen told me that the installation costs would be under $3,000, and this would include everything. So far, the figure is over $4,000 and will be close to $5,000.

"Your representative also told me that the machines require very little maintenance and a full-time attendant would not be necessary. Actually, the machines require at least 2 hours maintenance a day and because of the constant malfunctioning, someone has to be there at all times in order to turn them off and correct any one of a myriad of troubles which constantly crop up.

"It is my opinion that the basic reason for our problems is because none of your local people really understood the machines during the installation. Again I want to point out that I followed your Mr. Whalen's advice to the letter since I know nothing about engineering or mechanical devices and I wanted to be sure that everything was done according to your company's recommendations.

"Whalen and your Mr. Wally Lundquist, who went to your school and is an approved serviceman, supervised the installation work. Unfortunately, they appear to have a very limited knowledge of the machines. Incidentally, the book which instructs as to the installation, etc., arrived when the installation was just about completed.

"As an example of how badly this whole matter has been

handled, I have a bill for plumbing in excess of $1,600. Whalen told me it would be around $600. The plumber installed very expensive double-strength copper pipe and we finally found that the book specified plastic pipe. Lundquist also sent me a plumbing bill for $160.

"As another example of the way this whole operation has dragged along, we received the financial recording material only yesterday, and have not yet received any of the advertising material for which we paid last fall. I was also told that the machines would have meters on them which would keep track of the number of loads. These meters are not on the machines. Neither have we received the signs for the front of the machines, and other in-store helps.

"In a limited way we have tried to operate for the past two weeks and have had nothing but trouble. The timers work very erratically. Sometimes the lights will say 'Extracting' and the machines will be turning at only 45rpm. On certain machines the timers won't work at all. Pressure builds up in the filters after 6 or 7 loads and a 'Don't Use' light comes on, requiring a back-wash. During the extracting cycle, some of the machines bang and vibrate terrifically, literally frightening customers away. Carbon granules seem to get in one of the filters, and while it does not cause any trouble with the clothes, we are sure it is not a normal condition. Mr. Lundquist comes over often and tries to fix the machines, but he is just not capable of doing it. Mr. Whalen also keeps reassuring me that everything is going to be all right, but the situation has become so bad that I have turned off and locked up the machines until your factory does something about them.

"In all fairness to Whalen, he is doing the very best he can but he is a salesman, not a mechanical engineer. There is no doubt but that this whole operation was grossly misrepresented to me. Had I known what I know today, I would never have gone into this business. However, I will attempt to make the best of a bad situation, providing a factory technical representative is sent

up here immediately, and at your expense, to see if anything can be salvaged from this mess.

"At this point I have over $20,000 tied up in a non-productive operation and this is naturally causing me a considerable amount of worry. I trust I will hear from you and that you will be able to do something to relieve my problems.

* * * * *

cc: Mr. Jim Westercamp
Ellis-Watts Company
Williamsburg, Ohio

Executive Vice President
Small Equipment Co.
American Laundry Machinery Co.
Cincinnati 12, Ohio

"P. S. Perhaps one of the most frustrating things about the whole matter is that the machines are capable of turning out beautifully clean clothes. Where a load has gone through without a hitch, the people have had nothing but praise."

Other letters introduced in evidence by plaintiff having a bearing upon the matter of notice are as follows:

"SMALL EQUIPMENT SALES
AMERICAN LAUNDRY MACHINERY INDUSTRIES
Division of McGraw-Edison Company
5010 Section Ave., Cincinnati 12, Ohio
Redwood 1-5500

"February 8, 1962

"Mr. C. O. Moosbrugger
1491 Edgcumbe Road
St. Paul 16, Minnesota
"Dear Mr. Moosbrugger:

"I wish to acknowledge receipt of your letter of January 30, 1962, addressed to the attention of Mr. H. G. Williams, of Econ O Wash, Inc., Omaha, Nebraska.

"While it is somewhat difficult for us to comment on charges

made to you by the plumber, and Mr. Lundquist, of Econ O Wash, Inc., we are concerned about the mechanical difficulties you mentioned.

"If it is agreeable with you we would like to send our Service Manager, Mr. James Westerkamp, to St. Paul and further would like to do this sometime during the week of February 12.

"Unless we hear from you that this would not be convenient, we will schedule that trip now, and advise you by telephone at least one day in advance as to the specific day Mr. Westerkamp will be there.

"Very truly yours,
J. A. COLEMAN
Manager

"JAC/p
cc: Fred H. Allen
      C. King
      H. G. Williams"

"SMALL EQUIPMENT SALES
AMERICAN LAUNDRY MACHINERY INDUSTRIES
Division of McGraw-Edison Company
5010 Section Ave., Cincinnati 12, Ohio
Redwood 1-5500

"August 27, 1962

"Stringer, Donnelly and Sharood
Attorneys at Law
E-903 First National Bank Building
Saint Paul 1, Minnesota
    Re: Mr. C. O. Moosbrugger
    Attention: Mr. Henry H. Cowie
"Dear Mr. Cowie:

"On August 16, you addressed correspondence to Mr. Bersted, President of McGraw Edison Company with copies to other interested parties.

"I am acknowledging receipt of the copy addressed to Small Equipment Sales.

"We are aware of problems that Mr. Moosbrugger is having and are making arrangements for giving him full field assistance sometime within the next two weeks in an effort to put his equipment in proper operating condition. Because of the complexities of the transaction involving our company, an independent dealer, and the Equipment Acceptance Corporation, it would appear that reconditioning of the equipment is the simplest answer.

"We are prepared to do this and accept the responsibility for seeing to it that the equipment is put in first class operating condition. This we believe can be done in the field, but if we find it is impossible, [we] will entertain other means of taking care of Mr. Moosbrugger. We intend to see that he gets a fair break and treatment in this matter.

"Your customer may expect to hear from our Service Manager within the next two weeks indicating specifically, when, our field service man can get to his store with the necessary parts to undertake this work.

"Very cordially yours,
R. A. STANLEY"

■ It is the claim of defendants that this evidence does not establish the giving of notice sufficient under the requirements of Minn. St. 1961, § 512.49,[2] to support an action for breach of warranty (in this case a breach of implied warranty). Defendants base this contention on cases which require a claim for damages in the notice of breach of warranty and on cases stating mere complaint concerning a product is not enough. They argue that plaintiff's letter of January 30, 1962, was no more than a

---

[2]Minn. St. 1961, § 512.49, provided: "In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

complaint, relying on Truesdale v. Friedman, 270 Minn. 109, 122, 132 N. W. (2d) 854, 863; Marsh Wood Products Co. v. Babcock & Wilcox Co. 207 Wis. 209, 225, 240 N. W. 392, 398; Chess & Wymond Co. v. La Crosse Box Co. 173 Wis. 382, 387, 181 N. W. 313, 315.[3]

It is true that the Truesdale case contains language suggesting that mere complaint as to quality is insufficient notice of breach of warranty and that the notice required by the Uniform Sales Act (identical to § 512.49) must apprise the seller of the buyer's intention to claim damages for breach of warranty. This was the holding of Truslow & Fulle, Inc. v. Diamond Bottling Corp. 112 Conn. 181, 151 A. 492, 71 A. L. R. 1142, commented on in 15 Minn. L. Rev. 480. However, the Truesdale case was primarily concerned with the time for giving notice and the requirement of pleading such notice in breach of warranty cases.

In Gilger v. Montgomery Lbr. Co. 73 S. D. 599, 47 N. W. (2d) 281, the South Dakota court held that where the notice given by the plaintiff was timely, clearly advised the defendants of the alleged defects, and requested defendants to do something about the defects, it was sufficient even though no express claim for

---

[3]In his comments on the Minnesota Uniform Commercial Code, Professor Robert McClure states that Minn. St. 336.2-607(3)(a) is similar to Minn. St. 1961, § 512.49, and, citing the Truesdale case, concludes that the new subsection is similar to § 512.49 and "does not change the requirement that the notice must be of a claim for damages for breach and that a vague complaint about quality is not sufficient." 21A M. S. A. p. 548. However, the comment to the Uniform Commercial Code, § 2-607(3)(a), states:

"The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. * * * Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification * * * need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." 1 U. L. A. Uniform Commercial Code (Master ed.) p. 377. For further discussion, see Annotation, 17 A. L. R. (3d) 1010, 1111.

damages was made by plaintiff. The courts have generally held, as stated in 46 Am. Jur., Sales, § 257:

"Notice of breach of contract which a statute requires a buyer to give the seller in order to hold him liable after acceptance need take no special form. It seems clear that it must refer to particular sales, so far as that is practicable; that it must at least fairly advise the seller of the alleged defects; and that it must be such as to repel the inference of waiver."

Kopet v. Klein, 275 Minn. 525, 148 N. W. (2d) 385, decided subsequent to the Truesdale case, and relied upon by plaintiff, involved primarily the issue of timeliness of notice. In that case defendant was a distributor of water-softening devices and sold such a device to plaintiff. The device was installed by defendant and his local agent and after 2 weeks plaintiff contacted the agent and informed him of the difficulties he was experiencing with the device. The agent made several unsuccessful attempts to correct the difficulty. Six months later, plaintiff notified the defendant of the unsatisfactory performance and defendant attempted to rectify the difficulties without apparent success. Six months after direct notification of defendant and 1 year after installation, plaintiff's attorney advised defendant that the unit was not operating properly and that he should replace it or refund the purchase price. Defendant contended that plaintiff failed to give proper notice of breach of warranty and his intent to claim damages within a reasonable time, citing the Truesdale case as controlling. This court in the Kopet case said (275 Minn. 530, 148 N. W. [2d] 390):

"* * * The Truesdale case holds that the time when the buyer becomes aware or should have become aware of the claimed defect fixes the time from which the delay commences and from which the reasonableness or unreasonableness of the delay must be determined. We held in that case that a delay in notification from 12 to 23 months would be unreasonable as a matter of law when the buyer is aware, or should be aware, of the defect. There

was no such delay in notification in the instant case. It first came within 2 weeks after the purchase had been made and was continuous thereafter running over a period of a year during which plaintiff cooperated with defendant in trying to remedy the defects before finally, at the end of that time, notifying defendant that unless the water softener could be placed in working order as warranted, he should install a properly functioning softener or return to plaintiff the purchase price. There is no merit in defendant's claim that notice was not given within a reasonable time, and the requirement of the statute with respect to notice was sufficiently complied with."

In the Kopet case we cited Inland Products Corp. v. Donovan Inc. 240 Minn. 365, 374, 62 N. W. (2d) 211, 219, for the proposition that any delay between the time plaintiff knew or should have known of the difficulty and the time of the commencement of the suit was due to the indulgence and cooperation by the plaintiff in defendant's attempts to remedy the defects and that the period of delay should not be charged to the buyer to his detriment.

We think the reasoning in the Kopet case is controlling in the instant case. The contents of plaintiff's letter of January 30, 1962, clearly were sufficient to put defendants on notice that the machines were not working properly and that plaintiff felt the machines had been "misrepresented" to him. Although this was not an express claim for damages, under the Kopet and Inland Products cases the letter was both sufficient and timely notice for the purposes of § 512.49.[4]

---

[4]Plaintiff contends that if his letter, standing alone, is not legally sufficient notice, defendants are estopped from setting up want of notice or timeliness of notice by virtue of their assurances in their letters, both of which acknowledged receipt of notice of plaintiff's problems with the dry-cleaning machines and promised to rectify the defects therein, thus inducing plaintiff to forbear from further notifying defendants or seeking legal recourse until the present action was brought in October 1962. Plaintiff's claims have support in Inland Products Corp. v. Donovan Inc. 240 Minn. 365, 374, 62 N. W. (2d) 211, 219.

■ It should also be kept in mind that the breach of warranty involved here is at least in part an implied one. The doctrine of implied warranty is intended to protect the consumer and should be applied to reach a just result. To deny protection to plaintiff because of failure to claim damages in his letter of January 30, 1962, would allow defendants to escape their responsibilities under the law by a technicality. In all fairness the notice here, as discussed above, was adequate to satisfy the intention of the statute. We stated in the Kopet case (275 Minn. 531, 148 N. W. [2d] 390) that an implied warranty is imposed by law for the protection of the buyer and does not depend upon the affirmative intention of the parties, and that the doctrine of implied warranty is to be liberally construed since the rule is an equitable one.

■ In their motion for judgment n.o.v. or a new trial, defendants contended that the trial court erred in failing "to give adequate instruction on notice of breach of warranty"; that the instructions "considered as a whole were inadequate and failed to properly instruct the jury"; and that the court erred in not giving defendants' requested instructions.

No objection was in fact made and no exception was taken to the charge. Since the claimed errors set out in the motion for a new trial are not with respect to fundamental law or controlling principle, defendants were required to raise such objections before the jury retired, stating distinctly the matters to which they objected and the grounds for such objections. They did not do so and therefore cannot assign such claimed errors in their motion for a new trial. Rule 51, Rules of Civil Procedure.

Furthermore, the claimed errors, if any in fact concerned fundamental law or controlling principle, are altogether too indefinite and vague, considering the many principles of law discussed by the court in the charge. What part or parts of the charge were "likely to convey * * * an erroneous understanding of controlling principles of law"? An assignment of error, to be valid, must point to a specific error of law and cannot be vague and indefinite. See, Herbst v. Suilman, 259 Minn. 292, 293, 107

N. W. (2d) 45, 46; Lehman v. Hansord Pontiac Co. Inc. 246 Minn. 1, 74 N. W. (2d) 305.

Defendants appear to contend that the trial court should have adopted and incorporated their requested instructions verbatim. However, we have frequently held that the trial court has considerable latitude in the language used and that if the charge read as a whole adequately represents the law on the issues involved, we will not reverse simply because the litigant preferred to use other language. As is well settled in this state:

"* * * All that is required is that the charge as a whole convey to the jury a clear and correct understanding of the law. It is unnecessary that every possible opportunity for misapprehension be guarded against. If the charge fairly lays down the law of the case, it is sufficient. Usually it is preferable to give a general charge, if practicable, upon the whole law of the case rather than to run the risk of overemphasizing one side of the case or confusing the jury as is often done by giving requested instructions or particularizing upon specific items." Cameron v. Evans, 241 Minn. 200, 208, 62 N. W. (2d) 793, 798.

See, also, Manion v. Tweedy, 257 Minn. 59, 64, 100 N. W. (2d) 124, 128.

Considering the instructions of the court as a whole, we reach the conclusion that the jury was adequately instructed upon the evidence and the theory under which defendants presented their case. By not objecting to the instructions given before the jury retired, defendants waived their right to complain on appeal. The rule that inadvertent error in the instructions to the jury may not, for the purpose of securing a review thereof on appeal, be called to the attention of the trial court for the first time in the notice of motion for a new trial has been the rule in this jurisdiction since Steinbauer v. Stone, 85 Minn. 274, 88 N. W. 754. See, also, MacIllravie v. St. Barnabas Hospital, 231 Minn. 384, 387, 43 N. W. (2d) 221, 224.

■ Defendants contend the trial court erred in admitting evi-

dence that other purchasers of the machines had had similar difficulties with them. Evidence of similar difficulties in identical machines has been held admissible at the discretion of the trial court in a breach of warranty case in this state. In Harris v. Simplex Tractor Co. 140 Minn. 278, 167 N. W. 1045, this court considered the question of whether the trial court erred in admitting testimony that other machines of the same kind, made by the defendant in the same manner and put out the same season, developed the same imperfections. There we stated (140 Minn. 279, 167 N. W. 1045):

"* * * This evidence tended to show that the fault was in the structural design and plan of the machine, and did not arise from some defect peculiar to this particular machine which could be remedied by replacing defective parts, and the evidence was admissible for that purpose." [5]

The case on which defendants rely, Virtue v. Creamery Package Mfg. Co. 123 Minn. 17, 142 N. W. 930, 1136, L.R.A. 1915B, 1179, did not involve a breach of warranty claim but instead a claim that defendants wrongfully and maliciously interfered with the business of plaintiff by misrepresentation, threats of litigation, and the malicious prosecution of two patent infringement suits. That case is not controlling here.

■ The jury was instructed by the trial court that if it imposed liability on defendants, it might award plaintiff interest at 6% per annum "to this date on the various constituent items [of damages] from the date they were respectively paid or incurred." Plaintiff argues that the trial court erred in failing to compute and allow interest as requested by him and in denying his motion for a correction of the verdict in that respect. On appeal plaintiff relies on Minneapolis Harvester Works v. Bonnallie, 29 Minn. 373, 13 N. W. 149, and Merrick v. Wiltse, 37 Minn. 41, 33 N. W. 3, for the proposition that as a matter of law

---

[5]See, also, Dempster Mill Mfg. Co. v. Fitzwater, 6 Kan. App. 24, 49 P. 624; McNamara v. E. W. Ross Co. 225 Mich. 335, 196 N. W. 336; Annotation, 66 A. L. R. 81, 92.

he is entitled to interest from the original date of the contract. We do not find that those cases furnish any precedent for so computing interest in this case. It is obvious that the Merrick case requires no such result and supports the Minneapolis Harvester case *only* for the rule that plaintiff cannot rescind for breach of warranty. The interest referred to in the remand in Merrick is obviously interest from the date of the verdict, not from the date of the contract or the breach as plaintiff contends.

The Minneapolis Harvester case does appear to condone interest from the date of the breach of warranty as an element of damages. However, since no instruction as to interest with respect to the purchaser's recovery in that case was requested or given, it is impossible to determine whether the jury included interest or not. The court presumed the award of $85 to include interest, but why it did so is not clear. In any event, those cases certainly do not hold that as a matter of law the measure of damages in a breach of warranty suit is the difference between the value as warranted and the true value plus interest from the date of the contract.

The general rule in this state is to require interest in the case of a liquidated claim or a sum certain and not to allow interest in a case of an unliquidated claim because a defendant does not know how much he owes until the verdict is reached. However, Minnesota has adopted the position that where a claim is unliquidated but ascertainable by computation or reference to generally recognized standards such as market value and the claim does not depend upon any contingency, interest shall be allowed the same as for a liquidated claim. Grand Forks Lbr. Co. v. McClure Logging Co. 103 Minn. 471, 115 N. W. 406; Swanson v. Andrus, 83 Minn. 505, 86 N. W. 465; 5 Corbin, Contracts, § 1048.

In Employers Lia. Assur. Corp. v. Morse, 261 Minn. 259, 266, 111 N. W. (2d) 620, 626, this court said:

"Plaintiffs contend that they are entitled to interest on the amount of damage on the stock loss from the time the damage

occurred. Much of a lengthy record is devoted to proof of the amount of damages. Part of the damage is based on a total destruction of goods and merchandise; part on the partial destruction of other items of merchandise; and part on damage to fixtures. The salvage value of the goods partially destroyed was involved as well as the reasonable cost of repairing fixtures. The jury returned a general verdict. It was impossible for defendant to know how much he must pay until the jury had assessed the damage. Where the amount of liability has not been ascertained, there is no liability for interest thereon prior to the time of its ascertainment. The right to interest here is governed by Minn. St. 549.09."[6]

That rule is applicable here.

Other issues raised have been considered, but discussion of them is unnecessary. The evidence appears to us to be more than sufficient to sustain the jury's verdict and its award of damages.

Affirmed.

---

[6] Minn. St. 549.09 provides: "When the judgment is for the recovery of money, including a judgment for the recovery of taxes, interest from the time of the verdict or report until judgment is finally entered shall be computed by the clerk and added thereto."