INSTRUMENTATION SERVICES,
INC., Respondent,

v.

GENERAL RESOURCE CORP., et al.,
defendants and third-party
plaintiffs, Appellants,

Dynamic Air, Inc., third-party
defendant, Respondent,

Durwood Schlee, third-party
defendant, Respondent.

No. 48552.

Supreme Court of Minnesota.

Aug. 17, 1979.

Rehearing Denied Oct. 1, 1979.

Leonard, Street & Deinard, Morris M. Sherman, and Stephen J. Davidson, Minneapolis, for defendants and third-party plaintiffs, appellants.

Edward A. Towey, St. Paul, for Instrumentation Services, Inc.

Jacobson & Johnson, Marvin Jacobson, St. Paul, for Dynamic Air, Inc.

Efron & Roberts and Miles E. Efron and George W. Roberts, Minneapolis, for Durwood Schlee.

Heard before PETERSON, KELLY, and SCOTT, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Plaintiff, Instrumentation Services, Inc. (ISI), sued defendant third-party plaintiff Fluidizer, Inc.[1], to recover in full on a subcontract it had with Fluidizer to perform work on a pneumatic conveyor system that Fluidizer had agreed to build for Standard Dry Wall Products, Inc. Fluidizer counterclaimed and, in addition, asserted against third-party defendants Dynamic Air, Inc. (a Fluidizer competitor) and Durwood Schlee (a former Fluidizer employee employed by Dynamic Air) claims that illegal acts by ISI, Dynamic Air, and Schlee had deprived Fluidizer of its underlying contract with Standard and had enabled Dynamic Air to obtain the construction contract.

The court below, in a bench trial, in its initial order and memorandum dated November 8, 1977, held against Fluidizer and held that ISI was entitled to recover, on a quantum meruit basis, for the work it had performed. In its final order and memorandum, dated December 13, 1977, the trial court ruled that ISI was entitled to recover in full on the subcontract. Fluidizer appeals from judgment entered January 13, 1978, in favor of ISI, Dynamic Air, and Schlee. We affirm the trial court's holding on Fluidizer's counterclaim and amended third-party complaint. We reverse the trial court's holding that ISI was entitled to recovery of the full price on the subcontract, since ISI only partially completed its performance; we remand with the direction that the trial court ascertain the amount of savings realized by ISI from nonperformance and deduct that amount from the contract price.

In January 1973, Donald Stearns, who resided in Florida and was under contract as Fluidizer's sales representative, persuaded Standard, a corporation headquartered in Florida, to install a pneumatic conveyor at its proposed plant in Newark, California. Stearns sent Fluidizer a set of preliminary drawings that he had prepared for the conveyor system.[2] On March 27, 1973, Fluidizer transmitted to Stearns its formal proposal for the conveyor system in the sum of $258,077 for presentation to Standard.

---

1. General Resource Corporation, the parent company of Fluidizer, Inc., was also sued but it was not directly involved in the events which constituted plaintiff's cause of action.

2. Stearns' contact with Standard on the concept of installing a pneumatic conveyor system preceded his association with Fluidizer and was prior to any contact between Fluidizer and Standard. During 1970 and 1971, Stearns had worked on drawings for a pneumatic conveyor system for a proposed Standard plant in Orlando, Florida. That plant was never built.

Because the conveyor system required equipment and parts which had to be obtained by Fluidizer from others, inquiries were made to outside vendors, including ISI, for information and prices. ISI prepared a plan for the scaling and batching section of the conveyor system and presented its quotation to Fluidizer on March 23, 1973. On June 5, Standard formally accepted the Fluidizer proposal with the understanding that Fluidizer, before it began manufacturing or installing the system, would submit engineering and design drawings to Standard for approval. Fluidizer issued its acknowledgment of acceptance to Standard on June 7. On July 24, 1973, Fluidizer issued a purchase order (subcontract) to ISI for engineering and design drawings of the electronic scaling and batching section of the conveyor system.

On or about July 1, 1973, Schlee was assigned as Fluidizer's project engineer in connection with the Standard conveyor system. He was responsible for design, engineering, and cost evaluation of the system. Schlee completed approximately 90 percent of the engineering drawings for the proposed system. Effective November 2, 1973, Schlee discontinued his employment with Fluidizer and 3 days later became an employee of Dynamic Air.

Stearns telephoned Fluidizer on November 9, 1973, to express concern about the status of the conveyor system and to suggest ways to get the project moving. At about the same time, Fluidizer began to re-estimate the cost of the conveyor system. Fluidizer determined that it would have to obtain additional monies for its proposed system and that it would have to substantially increase the proposal price. In mid-November 1973, Fluidizer informed Stearns that it was re-evaluating its original proposal and that it expected to submit a new proposal at an elevated price.[3]

Fluidizer prepared a new proposal, and a meeting was scheduled with Phil C. Donnel-

ly, president of Standard. On December 17, 1973, Fluidizer submitted its new proposal to Standard and, according to Donnelly, stated that it was withdrawing its original March 27 proposal. Fluidizer's counsel similarly admitted at oral argument that Fluidizer had said it would not perform the contract for the amount originally proposed. The total amount of the December 17 proposal was $423,000—$268,243 represented cost; $154,966 represented profit. This proposal covered more than Fluidizer's increase in expenses since the March 1973 proposal (which limited price escalation to 3 percent) —it allowed Fluidizer a profit 58 percent greater than the profit figured in its original proposal. No one denies that Donnelly was upset by the increase.

Shortly after the meeting, Donnelly informed Stearns that he wanted another bid, and Dynamic Air was called upon to submit a bid. Earlier, sometime between mid-November and early December 1973, after learning of Fluidizer's probable increase, Stearns had requested that Dynamic Air be prepared to submit a bid for the Standard conveyor system. Schlee participated with other employees of Dynamic Air in the preparation of a formal bid for Standard. In mid-December 1973, Dynamic Air asked ISI to prepare a plan as subcontractor for Dynamic Air's proposal. While preparing its plan, ISI learned that Standard was the ultimate customer for both the Fluidizer and the Dynamic Air conveyor systems. ISI thereafter maintained separate and distinct files for each project. ISI submitted a quotation and plan to Dynamic Air on January 2, 1974. Dynamic Air submitted a proposal to Standard on January 5, 1974, in the amount of $338,947. Standard accepted the proposal and issued a purchase order on January 18, 1974.

## I. Fluidizer's Counterclaim and Cross-Complaint

█ Fluidizer has presented several theories for its cause of action against ISI,

---

**3.** As a result of a meeting on September 27, 1973, among Fluidizer, ISI, and Standard,

Fluidizer had already increased its March proposal by $22,000.

Dynamic Air, and Schlee. In its counter-claim and its amended third-party com-plaint, Fluidizer alleged that ISI was guilty of transferring confidential business infor-mation; that Dynamic Air and Schlee were guilty of conversion and of unfair competi-tion by misuse of trade secrets; and that ISI, Dynamic Air, and Schlee were guilty of interference with a customer relationship. The trial court properly held against Fluid-izer on all of the theories. Findings of fact, made by the trial court and supported by the record, demonstrated that the informa-tion Schlee allegedly used in developing the Dynamic Air proposal was general informa-tion and did not constitute use of trade secrets; that Fluidizer failed to prove Schlee or Dynamic Air had material assist-ance other than their own training, skill, knowledge, and experience in developing the Dynamic Air proposal or that ISI had transferred confidential Fluidizer business information to Dynamic Air; and that Fluidizer's loss of the contract for the Stan-dard conveyor system resulted from unilat-eral repudiation of its original commitment. Fluidizer does not on this appeal contest the trial court's rejection of these theories.

However, in post-trial memoranda, Fluid-izer presented still another theory: conspir-acy in unfair competition among Schlee, Dynamic Air, Stearns, and presumably ISI. In effect, Fluidizer argued that Schlee, Dy-namic Air, and ISI engaged in a conspiracy with Stearns to commit acts of unfair com-petition which resulted in Fluidizer's loss and Dynamic Air's gain of the Standard contract and that these acts constituted a breach by Stearns of contractual and fiduci-ary duties owed to Fluidizer.[4] Fluidizer sought leave to amend its original third-party complaint to conform to the evidence, arguing that Stearns' breach of fiduciary and contractual duties became apparent only during the trial and, further, that the issue had been tried with consent. Based upon its review of the case law and Rule 15.02, Rules of Civil Procedure, the trial court held that it was not proper for Fluid-izer to amend its third-party complaint. It further held that Fluidizer had not estab-lished a right to recover from any of the third-party defendants under the conspiracy theory. The validity of the theory of con-spiracy in unfair competition is the basis of Fluidizer's appeal with respect to its cross-claim and amended third-party complaint.

The crux of the various theories asserted by Fluidizer is that Fluidizer lost the con-tract for the Standard conveyor system be-cause of illegal acts by ISI, Dynamic Air, Schlee, and others. Only a shade of differ-ence, at best, separates these theories and, therefore, the trial court's findings of fact pertaining to the theories expressly pleaded by Fluidizer are important in analyzing Fluidizer's present theory of conspiracy in unlawful competition. Based upon relevant findings of fact by the trial court and upon our own independent review of documenta-ry sources, the evidence conclusively demon-strates that Fluidizer did not present suffi-cient facts to establish its cause of action.[5]

Fluidizer did not sufficiently establish that the alleged conspirators met upon a plan or purpose of action to deprive Fluidiz-er of the Standard contract. Contrary to Fluidizer's claims, the trial court found, with ample support in the evidence, that no drawings, sketches, catalogs, documents, pricing policies,[6] or information of any kind belonging to Fluidizer was used by Dynam-

---

4. Stearns was not a party to this proceeding. Fluidizer concedes that Schlee was under no covenant or restriction with respect to competi-tion.

5. We therefore need not discuss the propriety of the trial court's refusal to allow Fluidizer to amend its third-party complaint.

6. There is some indication in the record that Stearns provided limited guidance to Dynamic Air in determining the overall price of Dynamic Air's bid. The president of Dynamic Air testi-fied that when Dynamic Air prepared its bid, Stearns would indicate whether the price was too high or too low and that on two occasions Dynamic Air went to Stearns with a bid and was told that the total figure was too high. However, there is no indication that Fluidizer's pricing policies were conveyed by Stearns to Dynamic Air or that Dynamic Air used such

ic Air to prepare its proposal; that no confidential Fluidizer business information or trade secrets were transferred or converted by Schlee, Dynamic Air, or ISI; and that Fluidizer's loss of the Standard contract was due to its refusal to perform the original contract and its submission of a second proposal at a greatly increased price. Implicit in these findings was the finding that Schlee, Dynamic Air, and ISI were not engaged in a conspiracy, either among themselves or with others, to deprive Fluidizer of the Standard contract. Furthermore, our examination of the record indicates that the evidence does not compel a finding of any such conspiracy.

Additionally, if Fluidizer had been able to establish that Dynamic Air, Schlee, and ISI had conspired with Stearns and aided him in breaching his contractual and fiduciary duties to Fluidizer, it nonetheless did not sufficiently demonstrate that it was damaged by such acts. Fluidizer was not deprived of an existing contract with Standard. The trial court's findings of fact properly established that the contractual relationship between Fluidizer and Standard was terminated by Fluidizer's unilateral withdrawal of its original proposal and its subsequent submission of a second proposal at a highly inflated price. Dynamic Air's bid became important only after the December 17, 1973, meeting at which Fluidizer submitted its inflated second proposal. Thereafter, Standard began seeking additional bids, and Dynamic Air presented its bid to Standard only after it was asked to do so by Standard. For Fluidizer to contend that it would have regained the contract in the future is speculative and without sufficient foundation in the record. In sum, Fluidizer suffered no damages, because it abandoned any expectation of retaining the contract when it repudiated the original proposal and presented a second proposal. See, *Abbott Redmont Thinlite Corp. v. Redmont,* 475 F.2d 85 (2 Cir. 1973).[7]

## II. ISI's Cause of Action

The key document in ISI's claim against Fluidizer was the purchase order (subcontract) between ISI and Fluidizer dated July 24, 1973, which called for shipment of "Engineering design and drawings of scaling and batching system for S.T.D.

---

pricing policies in formulating its bid. In fact, the Dynamic Air conveying system was properly found by the trial court to be materially different from Fluidizer's proposed conveyor system.

7. While Fluidizer labels its theory as "conspiracy in unlawful competition," its arguments often seem to be directed toward a theory of unjust enrichment, although Fluidizer does not specifically admit that such a theory is a basis for its recovery. For example, Fluidizer argues at one point that even if it lost any expectation of the Standard contract, it is nonetheless entitled to the profits realized by Dynamic Air on the Standard contract because Dynamic Air gained the contract only as a result of Stearns' breach of his contractual and fiduciary duty to Fluidizer.

If this was Fluidizer's theory, it would not be entitled to recovery because it is clear that the theory of unjust enrichment was not alleged in Fluidizer's pleadings, was not tried by consent at trial, and, in this case, could not properly be raised by post-trial motion. Further, to establish a basis for recovery against Schlee or Dynamic Air, Fluidizer would first have to show that Stearns breached a duty owed to Fluidizer. Stearns' activity with Schlee and Dynamic Air regarding the Standard conveyor system began after Fluidizer notified Stearns that it was going to substantially increase the price of its original proposal, essentially indicating that it would refuse to honor the original agreement with Standard. While the record is unclear, there is some evidence that Stearns also was an agent of Standard. If Stearns was an agent of Standard, he owed a duty to Standard and was obligated to seek back-up proposals when it became clear that Fluidizer was going to withdraw its original proposal and insist upon a more costly second proposal. Furthermore, Fluidizer, as principal, owed fiduciary and contractual duties to Stearns. Fluidizer arguably breached those duties to Stearns, the prime mover of the Standard conveyor system, when it increased the price of its original proposal, thereby indicating an intention to repudiate the original agreement with Standard. The evidence does not sufficiently establish that Stearns' actions toward Fluidizer were improper.

dry wall * * *." A provision of the purchase order specifically provided, "Engineering drawings include panel front, electric schematics and conduit wiring, etc." It is uncontroverted that engineering drawings of the panel front were delivered to Fluidizer by ISI, but that drawings of electrical schematics and conduit wiring were not. The purchase order also provided: "There is no understanding or agreement pertaining to this order other than expressed herein or in other written agreements between the parties."

On July 27, 1973, a meeting was held by representatives of Fluidizer and ISI to review the items to be delivered in fulfillment of the purchase order. Schlee prepared a memorandum of the meeting for Fluidizer, which stated, in pertinent part: "I.S.I. or Instrumentation Services Inc., are to furnish [an] engineering service, including a graphic panel print with manual operation instructions. To be completed in two or three weeks for customer approval." Dennis Brady, design engineer for ISI at that time, also prepared a memorandum of the meeting. The relevant portion of his memorandum stated: "Dennis [Brady] asked what the scope of 'Engineering' as required in the first phase was to be. Woody [Schlee] indicated that his drawings would give size and function but would not be fabrication drawings. Also, that conduit drawings would not be required until after the Engineering phase had been approved." The memoranda, ISI argued, established that ISI was to provide only drawings of the panel front and that ISI had therefore completely performed under the contract.

ISI invoiced Fluidizer for the amount of the purchase order on November 9, 1973. By mid-January 1974, Fluidizer learned that Standard had accepted the bid from Dynamic Air.

In a letter dated January 24, 1974, Fluidizer informed ISI that it would not pay the November invoice because the purchase order "was subject to cancellation if we did not get an order from Standard Dry Wall, which we have not." Fluidizer never requested further performance by ISI and never paid ISI the amount of the invoice.

Notwithstanding the language of the purchase order, the trial court held that ISI had fully performed under the contract. The trial court found that the phrase in the purchase order—"Engineering drawings include panel front, electric schematics and conduit wiring, etc."—was ambiguous and did not make clear whether electrical schematics and drawings of conduit wiring were required. The trial court then used the memoranda of the July 27, 1973, meeting between ISI and Fluidizer as extrinsic evidence to further find that the parties intended ISI to complete only the drawings of the panel front.

We hold that the trial court erred. The words "electric schematic" and "conduit wiring" appear in the purchase order and are unambiguous. The language of the purchase order clearly defines engineering drawings to include drawings of electrical schematics and conduit wiring. Extrinsic evidence (oral testimony regarding the July 27, 1973, meeting or the memoranda of that meeting) cannot be used to create an ambiguity in a document. The fact that the parties met to decide what the purchase order called for cannot be used to demonstrate that the purchase order was ambiguous; ambiguity must be found in the language of the document itself. The language of the purchase order was clear, and we hold that ISI did not fully perform its contract with Fluidizer.

However, ISI is entitled to recovery against Fluidizer on another theory. By unilaterally repudiating the underlying contract with Standard and by specifically telling ISI that it refused to process the invoice because of loss of the Standard contract, Fluidizer materially breached the subcontract with ISI. Fluidizer's acts essentially prevented ISI from completing the contract; there was no reason for ISI to tender further performance. Where one party repudiates a contract and the nonbreaching

party has only partially completed its performance, the nonbreaching party may sue on the contract without completing performance or he may sue, on quantum meruit, for the value of benefit conferred by partial performance. In the present case, the cause of action by ISI was based upon breach of contract and ISI is therefore entitled to damages.[8]

We believe that the present case is analogous to a situation in which a building contractor only partially performs a construction contract because of material breach by a landowner. Under those circumstances the basic rule is that the contractor is entitled to recover the contract price less the savings realized from not being required to fully perform the contract. Dobbs, Remedies, § 12.24. We therefore hold that ISI is entitled to the full contract price minus the expenses it would have incurred to complete the work, plus interest at the legal rate.[9]

Because there is no showing in the record of the savings ISI realized because it was not required to fully perform the subcontract with Fluidizer, we remand to the trial court with directions that it ascertain the amount of savings realized by ISI.

Affirmed in part; reversed in part and remanded.

---

8. Fluidizer argues that ISI is not entitled to recovery on the contract because Fluidizer could, according to the terms of the purchase order, cancel the subcontract with ISI if it lost the Standard contract. Furthermore, Fluidizer argues that because ISI performed similar engineering work for Dynamic Air on its bid, ISI would receive double payment for the engineering work. Neither argument is persuasive. The purchase order did provide that it was subject to cancellation if Standard cancelled the contract. However, Standard did not cancel the contract. Fluidizer itself unilaterally withdrew the original proposal. Similarly, the trial court properly found that the system used by Dynamic Air was different from the system proposed by Fluidizer and that ISI was not performing the same engineering work on each system.

9. ISI contends that it is entitled to more than interest at the legal rate. ISI first argues that it is entitled to a service charge of 1½ percent per

month on the amount due from Fluidizer, as evidenced by an explicit term in its original proposal to Fluidizer. ISI argues that the purchase order was issued in response to the original proposal and that the purchase order therefore embodied all of the provisions in the proposal. We do not agree. The purchase order constituted the contract between ISI and Fluidizer; there is no showing that Fluidizer accepted the terms of ISI's original proposal. There is, therefore, insufficient evidence that Fluidizer ever agreed to the 1½ percent per month service charge provided for in that proposal.

ISI also argues that it had a liquidated claim against Fluidizer and thus it was entitled to prejudgment interest. As evidenced by our holding against ISI on its cause of action, ISI does not have a liquidated claim and, therefore, is not entitled to prejudgment interest. See, *Moosbrugger v. McGraw-Edison Co.*, 284 Minn. 143, 160, 170 N.W.2d 72, 82 (1969).