**SAN FRANCISCO REAL ESTATE INVESTORS, Respondent,**

v.

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF ST. PAUL, Appellant.**

**No. C5-84-844.**

Court of Appeals of Minnesota.

Dec. 24, 1984.

John M. Mason, Dorsey & Whitney, Minneapolis, Terry C. Smith, Langlais, Smith, Mooney, Gilbert & Lattimore, St. Paul, for respondent.

David C. Forsberg, Margaret K. Savage, Briggs & Morgan, St. Paul, for appellant.

Heard, considered and decided by LANSING, P.J., and HUSPENI and CRIPPEN, JJ.

## OPINION

LANSING, Judge.

San Francisco Real Estate Investors (San Francisco) brought suit against American National Bank and Trust Company of St. Paul (American) in December 1979, requesting both a declaratory judgment construing certain provisions of a lease and money damages for alleged rent arrearages. The trial court determined that San Francisco's interpretation of the lease was correct and awarded San Francisco $127,496 in damages. American appeals; San Francisco cross-appeals, asking this court to construe, in addition, lease provisions relating to parking space rental. We affirm in part and remand in part.

## FACTS

In 1971 respondent San Francisco's predecessor in interest, Transamerica Investment Group (TIG), was contemplating construction of a major office building in downtown St. Paul, Minnesota. TIG negotiated with American as a prospective major tenant of the building, and after extensive negotiation, a lengthy and complex lease agreement was reached. The agreement was executed September 17, 1971, and commenced when American began occupancy on June 20, 1974.

The lease provides for adjustments in American's rent to reflect fluctuations in taxes on the building premises, the parking spaces, and the land. The adjustment provisions of the lease refer to "lease years." The lease defines the first "lease year" as American's first partial year of occupancy plus the following calendar year—June 20, 1974, to December 31, 1975. Subsequent lease years are calendar years.

The complaint specifically addressed only § 2.5(a) of the lease, dealing with premises taxes, which reads in relevant part:

Commencing with the first lease year: * * * the rent set forth in Section 2.1 hereof shall be increased or decreased on an annual basis during each subsequent lease year by the amount by which Taxes are more or less than the Taxes incorporated in the rent during the preceding lease year (during the first lease year, that sum shall be assumed to be 70 cents, subject to the adjustment hereinafter referred to), multiplied by the number of square feet in the Premises * * *. During each lease year commencing with the second lease year, rent for the immediately preceding lease year shall be retroactively adjusted to reflect actual Taxes paid for that year and the resulting increase or decrease shall be paid or credited, as provided in Section 2.7 hereof.

Section 2.7 reads as follows:

As soon as practicable after the first lease year in which adjustments of rent *become effective* pursuant to the provisions of Section 2.5 hereof, and annually thereafter, Landlord shall advise Tenant in writing of the amount by which the rent set forth in Sections 2.1 and 2.3 hereof is increased or decreased by reason of the provisions of Section 2.5 hereof. Payment of any increase or credit for any decrease in such rent shall be made as follows: On the first day for the payment of rent following the furnishing of the statement referred to in the immediately preceding sentence of this Section 2.7, Tenant, in the event of an increase, shall pay to Landlord a sum equal to one-twelfth ($\frac{1}{12}$) of such annual increase multiplied by the number of months then elapsed, *commencing with the first day of the first lease year in which such adjustment became effective*, and, in advance, one-twelfth ($\frac{1}{12}$) thereof in respect of the then current month, and, correspondingly, in the case of a decrease, Tenant shall be entitled to a credit against the rent next becoming due, of a sum equal to one-twelfth ($\frac{1}{12}$) thereof multiplied by the number of months then elapsed, *commencing with the first day of the first lease year in which such adjustment became effective*. Thereafter, until the next statement shall be rendered, the monthly installments of rent shall be increased or decreased, as the case may be, by an amount equal to

one-twelfth (¹⁄₁₂) of such annual increase or decrease.

(Emphasis added).

Section 2.5(b) of the lease provides that adjustments to rent by reason of fluctuations in taxes on the parking spaces are to be handled as provided in § 2.5(a).

In 1976 (the second lease year) TIG billed American for rent adjusted for premises taxes due and payable in 1976 and made no retroactive adjustment for taxes assessed during 1975. In 1977 TIG billed American for taxes due in 1977 plus the difference between taxes paid in 1976 and taxes assessed in 1976. American paid but then objected and asked for a refund. Representatives of the parties discussed the billing, agreed on American's interpretation, and a refund was made to American.

San Francisco, a California real estate investment trust, purchased the real estate and lessor's interest from TIG in May 1978 and is the successor in title to TIG. San Francisco adopted the position TIG had attempted to take in 1977 that the lease unambiguously allows the landlord to make a retroactive adjustment to rent for a given year to reflect any increase or decrease in the real estate taxes *assessed* for that year. Assessed taxes in Minnesota become a lien in the year assessed, but the taxpayer is not notified of the amount until the next year, at which time the taxes are payable. Thus, San Francisco's interpretation would allow the landlord to retroactively collect an amount equal to the assessed taxes for any given year even though those taxes are not due until the next year.

American interprets the lease to allow a retroactive rent adjustment equal to taxes *due and payable* in a year. Under this interpretation the landlord can retroactively collect only the difference between estimated taxes and actual taxes due during any given year. American argues that San Francisco's interpretation unfairly gives the landlord more each year than is necessary to pay current taxes (assuming increasing taxes in each year) and alleges a potential overpayment of as much as $3.5 million by the end of the 30-year lease, composed of amounts received in advance of taxes due each year plus compounded interest. It contends that the lease language is ambiguous and that both extrinsic evidence of the parties' intent and two exhibits attached to the lease support its interpretation.

The trial court found the lease provisions ambiguous but also found American's extrinsic evidence of intent unclear. The trial court entered judgment in favor of San Francisco, awarding $127,496 in arrearages.

## ISSUES

1. Does the lease language unambiguously support either party's interpretation?

2. Should this court construe the lease provision relating to parking space rental?

3. Is recovery of prejudgment interest appropriate?

## ANALYSIS

### I

San Francisco contends that the lease language unambiguously requires American to pay for each year the taxes due and payable plus an adjustment to bring the amount paid for the prior year up to the assessed amount for that year. American contends it is obligated to pay only the taxes due and payable for any given year. Neither interpretation is readily apparent from the complex lease language. Read in the context of Minnesota real estate assessment procedures, however, the language is not ambiguous.

The lease explicitly defines "taxes" to mean taxes which may "be assessed, levied or imposed upon or become a lien upon the Building." In Minnesota taxes are "assessed" and "become a lien upon" real estate in the year preceding the year in which they are payable. *See* Minn.Stat. §§ 272.-31, 275.28, 276.01, .04 (1982 & Supp.1983). The plain meaning of the lease language, therefore, supports San Francisco's interpretation of § 2.5(a). In addition, the language in § 2.5(a), "During each lease year

commencing with the second lease year, rent for the immediately preceding lease year shall be retroactively adjusted to reflect actual taxes paid for that year," accomplishes that result.

Section 2.7 sets out the procedure to implement § 2.5(a). American argues that the phrase, "commencing with the first day of the first lease year in which such adjustment *became effective*," refers to the year in which tax liability is made known to the taxpayer and taxes are due. San Francisco argues that the phrase refers, instead, to the prior year, the year in which taxes were assessed and became a lien on the property.

Read carefully, § 2.7 also unambiguously supports San Francisco's interpretation. The first sentence refers to rent adjustments which "become effective pursuant to the provisions of Section 2.5." Section 2.5 provides for a *retroactive* adjustment. Also, the lease uses "taxes" as a term of art, defining the word specifically to refer to taxes at the time they are "assessed" or "become a lien upon" property. Thus, the adjustment reaches back to the year in which the taxes are assessed and is not limited to the year in which they are payable.

Finally, San Francisco's interpretation allows the three references in § 2.7 to the year in which adjustment became effective to be internally consistent. The first sentence of § 2.7 requires the landlord to give the tenant notice of the rent adjustment "as soon as practicable after the first lease year in which adjustments of rent become effective." Because the amount is not known until the year after taxes are assessed, notice cannot be given until the year in which they are due and payable. In determining by how many months the annual increase or decrease must be multiplied, the provision refers to the months elapsed, "commencing with the *first day of* the first lease year in which such adjustment became effective." American seeks to determine the number of months by which to multiply the rent increase by counting the elapsed months in the year when the taxes became due. To reach this result, "became effective" would have to mean "became due." If "became effective" were also read as "became due" in the first sentence of § 2.7 (regarding notice), however, that sentence would indicate that notice must be given as soon as practicable after the year the taxes became due. To read consistently, American's interpretation would require this court to add the phrase, "after the first day of," to the first sentence of § 2.7, in addition to those sentences in which it already appears. The absence of the phrase, "commencing with the first day," in the first sentence, however, indicates that the parties did not intend to use it there.

■ American introduced extrinsic evidence at trial indicating that the parties intended American's interpretation of the lease. TIG, San Francisco's predecessor in interest, originally billed in accordance with American's interpretation, changed its billing method in 1977, and then changed back to bill in accordance with American's interpretation again until San Francisco purchased TIG's interest in 1978. Although this evidence is persuasive, the lease was never amended in writing to reflect this intent, and oral amendments are explicitly prohibited by the lease.

■ American also argues that two exhibits to the lease support its position. Even if the exhibits do support American's position, the lease explicitly provides that nothing contained in the exhibits "shall be deemed to modify, alter or amend any provision contained in this lease."

If the lease language were ambiguous, this court could look to American's extrinsic evidence as support for its position. *See Instrumentation Services, Inc. v. General Resource Corp.*, 283 N.W.2d 902 (Minn.1979). However, the lease is not ambiguous. San Francisco purchased its interest in the lease as written, and this court must construe it as the embodiment of the parties' intent. *See Karger v. Wangerin*, 230 Minn. 110, 40 N.W.2d 846 (1950).

■ This lease is the result of lengthy negotiations between commercial parties, both represented by counsel. The adjustments do not constitute overpayment, as American argues, but rather reflect taxes that American agreed to pay and that the landlord must eventually pay. Although it is true that the lease language allows the landlord interest-free use of money, we decline to rewrite contract language already susceptible to a consistent logical interpretation. Therefore, we find San Francisco's interpretation persuasive, that "commencing with the first day of the first lease year in which such adjustment became effective" refers to the first day of the year in which taxes were assessed and became a lien on the property.

## II

■ San Francisco asks this court also for a determination of the rent adjustment regarding real estate taxes on parking spaces, dealt with in § 2.5(b) of the lease. Under § 2.5(b), parking space rental is to be adjusted "upon the basis set forth in Section 2.5(a)." Section 2.5(b) was raised tangentially in the complaint. Because our decision regarding the payment of premises taxes essentially resolves the issue of the parking space rent adjustment, we remand to the district court to calculate the additional amount due San Francisco for adjustment with respect to parking space taxes.

## III

■ San Francisco requests that this court award prejudgment interest on the damage award. The Minnesota Supreme Court has stated that a plaintiff is entitled to prejudgment interest "where the damages claim is liquidated or, if unliquidated, 'where the damages were readily ascertainable by computation or reference to generally recognized standards such as market value and not where the amount of damages depended upon contingencies or upon jury discretion (as in actions for personal injury or injury to reputation).'" *Summit Court, Inc. v. Northern States Power Co.,*

354 N.W.2d 13, 16 (Minn.1984) (quoting *Potter v. Hartzell Propeller, Inc.,* 291 Minn. 513, 518, 189 N.W.2d 499, 504 (1971)).

The *Potter* court noted that the underlying principle in determining whether prejudgment interest is to be awarded is that "one who cannot ascertain the amount of damages for which he might be held liable cannot be expected to tender payment and thereby stop the running of interest." 291 Minn. at 518, 189 N.W.2d at 504.

■ San Francisco's predecessor in interest, TIG, apparently interpreted the lease as did American—requiring a rental adjustment only for taxes due and payable in a given year. It was reasonable for American to rely on this interpretation in making its rental payments to TIG and initially to San Francisco, particularly considering the complexity of the lease language. Therefore, until they were notified to the contrary, American could not have been expected to ascertain the damages for which it might be liable and tender payment to stop the running of interest. *See id.*

Notice was given when San Francisco served its summons and complaint on American on December 27, 1979. We therefore remand to the trial court for a determination of prejudgment interest from that date.

## DECISION

We affirm the trial court's order because the lease language unambiguously supports San Francisco's interpretation that the appropriate rental adjustment should reflect real estate taxes assessed for a given year, rather than taxes due and payable. We remand for a determination of arrearages owed for adjustments with respect to parking space rental and for calculation of prejudgment interest from December 27, 1979.

Affirmed in part, remanded in part.